IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IGGESUND TOOLS AB, and
IGGESUND TOOLS, INC.

   Plaintiffs,

   v.

KEY KNIFE, INC.

   Defendant.

)
)
)
)
)
) CIVIL ACTION FILE
) NO.  1:07-cv-00949-WSD
)
)
)
)
)

**IGGESUND'S OPENING CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

IGGESUND'S OPENING CLAIM CONSTRUCTION BRIEF................................ i

I.      INTRODUCTION ........................................................1

II.     THE PATENTS IN SUIT................................................1

        A.      U.S. Patent No. 6,722,595 .................................1

        B.      U.S. Patent No. 6,951,313 .................................3

        C.      U.S. Patent No. 7,159,626 .................................4

III.    THE LAW OF CLAIM CONSTRUCTION .................................5

        A.      General Principals .......................................5

        B.      Claim Construction Begins With the Language of the Claim .............8

        C.      The Patent Specification Must Also Be  Considered When
                Construing The Claims.....................................8

IV.     IGGESUND'S PROPOSED CLAIM CONSTRUCTIONS .........................10

        A.      '595 Patent...............................................10

        B.      '313 Patent...............................................18

        C.      '626 Patent...............................................25

CONCLUSION ..................................................................40

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

**Cases**

*AbTox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir. 1997) ....................................................................7

*Autogiro Co. of Am. v. United States*,
384 F.2d 391 (Ct. Cl. 1967) ..........................................................................7

*Clearstream Wastewater Sys. v. Hydro-Action, Inc.*,
206 F.3d 1440 (Fed. Cir. 2000) ....................................................................7

*Corning Glass Works v. Sumitomo Elec.*,
868 F.2d 1251 (Fed. Cir. 1989) .................................................................5, 8

*Eastman Kodak v. Goodyear Tire & Rubber Co.*,
114 F.3d 1547 (Fed. Cir. 1997) ....................................................................9

*General Foods Corp. v. Studiengesellschaft Kohle GmbH*,
972 F.2d 1272 (Fed. Cir. 1992) ....................................................................5

*Johnson Worldwide Associates, Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) ......................................................................6

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) ....................................................................5, 8

*Nike Inc. v. Wolverine World Wide, Inc.*,
43 F.3d 644 (Fed. Cir. 1994) ........................................................................8

*Pentec, Inc. v. Graphic Controls Corp.*,
776 F.2d 309 (Fed. Cir. 1985) ....................................................................10

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct.
1332 (2006).......................................................................... 5, 6, 7, 8, 9, 13

*Renishaw PLC v. Marposs Societa' per Azioni*,
158 F.3d 1250 (Fed. Cir. 1998) ....................................................................7

*Sunrace Roots Enter., Co. v. SRAM Co.*,
    336 F.3d 1298 (Fed. Cir. 2003) .......................................................................9

*Terlep v. Brinkmann Corp.*,
    418 F.3d 1379 (Fed. Cir. 2005) .......................................................................7

*Toro Co. v. White Consol. Indus. Inc.*,
    199 F.3d 1295 (Fed. Cir. 1999) .......................................................................9

*Unique Concepts, Inc. v. Brown*,
    939 F.2d 1558 (Fed. Cir. 1991) .......................................................................8

*Vitronics Corp. v. Conceptronic*,
    90 F.3d 1576 (Fed. Cir. 1996) .......................................................................9

## I.    INTRODUCTION

Pursuant to the Local Patent Rules of this Court, Plaintiffs (hereinafter jointly "Iggesund") submit this Opening Claim Construction Brief addressing certain terms of the claims of the patents in suit which have been asserted against Defendant Key Knife.   The parties have exchanged proposed claim construction charts and supporting evidence and, having conferred thereon, prepared and filed a Joint Claim Construction Statement.

## II.    THE PATENTS IN SUIT[1]

### A.    U.S. Patent No. 6,722,595

This patent (App. Ex. 1, hereinafter the "'595 patent") discloses a knife and clamping assembly for use in a disk chip cutting machine.   Such machines are relatively large and include a rotating disk 10[2] on which a number of knives 12 are mounted, as shown in Figure 1 of the patent.   These chip cutting machines are used in the forest products industry to convert logs into chips used to make pulp or particle boards.

_____

[1]   Iggesund submits herewith an Appendix of Exhibits containing the Extrinsic and Intrinsic evidence it relies on (hereunder referred to as "App. Ex. __"). Key Knife will submit its own Appendix except that, for convenience, it will rely on copies of the Patents and file histories of the patents in suit at Exhibits 1 to 6 of Iggesund's Appendix.

[2]   The reference numerals used herein are the reference numerals used in the drawings and text of the respective patents.

The knife and clamping assembly of the '595 patent is shown in cross-sectional view in Figure 2 and includes a lower clamp element or "carrier part" 16, the knife 12, and an upper clamp element 18.  The knife is clamped in place between the clamp elements 16 and 18 by a bolt 20 which threads into the disk 10, or into a holder element (not separately shown) mounted in the disk.  This general arrangement was originally invented by Iggesund to enable the use of easily replaceable, disposable, knives, in chipping machines.   (See U.S. Patent No. 4,694,995, App. Ex. 10)).   Prior to the development of this so called "cassette arrangement" chip cutting machines, also referred to as chippers or chipping machines, used long, large knives which had to be resharpened by grinding operations when worn.  This is an expensive and time consuming process (during which time the chipper is out of operation).   In addition when remounting a reground blade special care in shimming the blade had to be taken to insure the knife edge was properly positioned for cutting.  The cassette structure avoids these problems.

Although the cassette and disposable knife arrangement of the '995 patent is advantageous, it was found that wood chips cut by the prior art knives would cause wear on the surface of the clamping element or carrier part 16 (also called a "counterknife") which faces the opening 14 in the disk 10 through which

the cut chips pass.  That part is expensive to manufacture and such wear required frequent replacement of the carrier part.

The inventors of the '595 patent conceived of a way to inexpensively overcome this problem with a new and unique knife configuration that includes a concave chip directing surface portion 22′ which is part of a rib or protrusion 24 extending beyond the carrier part 16 into the opening 14 so that the chips are directed away from carrier part 16 ('595 patent, Col. 2, lines 15-21).  As seen in Figure 2 of the '595 patent the tip or end of the rib 24 extends below the point where the surface 16a of counterknife 16 meets upper load bearing surface 16b of the carrier part which contacts the back surface 32 of the rib.

The Claims of the '595 patent asserted against Key Knife are directed to the combination of the unique knife in a clamping assembly mounted on a cutter disk.

### B.    U.S. Patent No. 6,951,313

This patent (App. Ex. 2, hereinafter the "'313 patent") is a "division" of the patent application which resulted in the '595 patent.  With minor changes the specifications of both patents are identical.  In this patent, however, the claims are directed to the configuration and shape of the knife alone.

### C.   <u>U.S. Patent No. 7,159,626</u>

This patent (App. Ex. 3, hereinafter the "'626 patent") discloses a woodworking knife which is suitable for use in a variety of wood working machines.  As illustrated in the patent the knife 32 is mounted in a two-piece clamping assembly (in principle similar to the clamping arrangement described in the '595 patent) which is mounted on the cylindrical surface of a drum or base 22 which rotates in the direction of the Arrow A in Figure 1.

The invention described and claimed in the '626 patent relates to the unique provision of clamping features on the back surface 40 of the knife body which cooperate with clamping features on the rear clamping component 18. Several embodiments are shown in the '626 patent.  In Figures 1 and 2 the illustrated embodiment uses clamping features 48, 50 in the form of spaced concave hollows or grooves which register with generally complementary shaped clamping features on clamping element 18 ('626 patent, Col. 10, lines 9-19).

In the embodiments shown in Figures 3-5 the clamping features of the knife are opposing inclined surfaces which face each other and are sized and shaped to localize the clamping forces from similarly flat inclined surfaces on clamping element 18 towards the cutting edges 34, 36 of the knife (Col. 11, lines 10-22).  These clamping features permit automatic positioning of the knife as the clamping assembly is tightened, while maintaining accuracy of position when the

knife is subjected to loads (Col. 11, lines 55-67) and they resist twisting or displacement of the knife during use  (Col. 4, lines 32-40).

### III.    THE LAW OF CLAIM CONSTRUCTION

#### A.    General Principals

A patent's claims are the numbered paragraphs that appear at the end of a patent.  They define the metes and bounds of the patent right that is conferred by the patent.  *Corning Glass Works v. Sumitomo Elec.*, 868 F.2d 1251, 1256 (Fed. Cir. 1989).  More specifically, they "define or delimit the scope of the legal protection which the government grant gives the patent owner, the patent 'monopoly.'"  *General Foods Corp. v. Studiengesellschaft Kohle GmbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992).

Courts construe patent claims as a matter of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  In the recent *en banc* decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006), the Federal Circuit provided a comprehensive restatement of the current law of claim construction, confirming that the most probative evidence of the meaning of patent claims is found in the intrinsic record - the claims, the specification, and to a lesser extent, the prosecution history. *Id.* at 1312-17.  The landmark *en banc* decision of *Phillips*

affirmed a number of principles that provide district courts with guidance on how

they should construe patent claims.  These principles include:

1.  The Court should construe the claims with the understanding of the terms held by persons of ordinary skill in the relevant art at the time of the invention.  *Phillips*, 415, F.3d. at 1313.

2.  The language of the claims is the primary source for defining the invention.  *Id*. at 1312.

3.  "There is a heavy presumption in favor of the ordinary meaning of claim language."  *Id*. at 1312-14.

4.  There must be a textual reference in the actual language of the claim with which to associate a proffered claim construction.  In other words, the context in which inventors use terms in a claim can be highly instructive.  *Id*. at 1314.  *Accord, Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999).

5.  If the claim language is clear, then courts will only consider other evidence to determine if there has been a deviation from the plain and ordinary meaning.  *Phillips*, 415 F.3d at 1313-14.

6.  Although the Court should read the claims in light of the specification, the Court should not import limitations from the specification into the claims.  *Id.* at 1323-24.

7.  The Court should not construe claim language to exclude a preferred embodiment or purpose of the invention. *Ibid*.

8.  The goal of claim construction is to clarify only those terms that require further definition, not to alter the scope of the invention or inject unnecessary

-6-

ambiguity into the claim language.  *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005).

9.  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1250 (Fed. Cir. 1998)).

10.  "It is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims…it prevents the narrowing of broad claims by reading into them the limitations of narrower claims."  *Clearstream Wastewater Sys. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000).

"Because the patentee is required to 'define precisely what his invention is,' the Court explained, it is 'unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.'" *Id.* at 1312 (citation omitted); *see also AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("the language of the claim frames and ultimately resolves all issues of claim interpretation"); *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 396 (Ct. Cl. 1967) ("Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth.  No matter how great the temptations of fairness or policy making, courts do not rework claims.  They only interpret them.").

## B.   Claim Construction Begins With the Language of the Claim

*Phillips* emphasized the "primary importance" of the claim language in determining exactly what is patented. *Id.* at 1312. Therefore, claims should be interpreted according to their plain language. *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994).

The claim language sets the boundaries of the claim's scope via a series of limiting words or phrases known as "elements" or "limitations." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed. Cir. 1989). Each claim element or limitation must be considered meaningful. *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed. Cir. 1991).

## C.   The Patent Specification Must Also Be Considered When Construing The Claims

"The claims, of course, do not stand alone"; rather they "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315. The specification is "highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*

While the language of the claims defines the scope of the claims, the claims should not be read in a vacuum; instead, "claims must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd* 116 S. Ct. 1384, 1394 (1994); *see*

*also Toro Co. v. White Consol. Indus. Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (claims are "not construed in a lexicographic vacuum, but in the context of the specification and the drawings."). Thus, the patent specification is highly relevant to the claim construction analysis and is usually the single best guide to the meaning of a disputed term. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The construing court, however, "does not accord the specification, prosecution history, and other relevant evidence the same weight as the claims themselves, but consults these sources to give the necessary context to the claim language." *Eastman Kodak v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed. Cir. 1997).

The Federal Circuit in *Phillips* made clear that, when construing claims, the primary focus remains on the claims, both asserted and unasserted. "Differences among claims can also be a useful guide [also] in understanding the meaning of particular claims terms." *Ibid*. For example, the doctrine of claim differentiation creates a rebuttal presumption that each claim in a patent has different scope, *Sunrace Roots Enter., Co. v. SRAM Co.*, 336 F.3d 1298, 1302-03 (Fed. Cir. 2003). That presumption, however, "is especially strong when the limitation in dispute is the only meaningful difference between an independent claim and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *Id*. at 1303.

## IV.   IGGESUND'S PROPOSED CLAIM CONSTRUCTIONS

For the convenience of the Court in tracking the various claim elements or limitations referred to, attached at Tab A are the asserted claims including, in parenthesis, the reference numeral, specification citation or file history citation, identifying that element or limitation in the illustrated embodiments of the patents.  The claims as set forth in Tab A are parsed in the same way as in the claim charts of the Joint Claim Construction Statement.

### A.   '595 Patent

### *Claim 1*

Claim 1 of the '595 patent is drafted in the so-called "Jepson" format, which means that all elements or limitations identified prior to the phrase "the improvement comprising" is treated as admitted prior art.  *See*, *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed. Cir. 1985).  In this case the combination of a rotatable cutter disk, knife holder and knife, *per se*, as broadly described in the claim prior to the words "the improvement comprising", is shown in the prior art such as the '995 patent and Key Knife's U.S. Patent Nos. 5,819,826 and 7,069,969.  (App. Exs. 7 and 8)

The following discussion sets forth each claim element to be construed, as set forth in the Joint Claim Construction Statement[3], in italics followed by Iggesund's statement of the reasons and support for the constructions it proposes in Joint Claim Construction Statement B-1.

***"a carrier part"***
***JCCS App. B-1 p. 2***

The carrier part of the invention defined in Claim 1 is the element 16 shown in Figure 2 and described at App. Ex. 1, Col. 1, 54 - Col. 2 line 1.  It is part of a cartridge (or clamping assembly) 17 which includes the clamping part 18.  The carrier part 16 is referred to in the specification as the "lower carrier" in the direction of travel of the cut chips.  Since this clamp element is the leading clamp element in the direction of travel of the knife during rotation of the disk it is sometimes referred to in the art as the forward part of the clamping assembly.  It is also referred to in the art as a "counter knife".  See Key Knife's '826 patent (App. Ex. 7, Fig. 5. Col. 4, ll. 20-24) and '969 patent (App. Ex. 8, Col. 6, ll.26-32, Col. 7, ll.13-15)

***"and upper load bearing contact surface…knife"***
***JCCS App. B-1, p. 3***

---

[3]   The abbreviation JCCS App __ p __ refers to the Joint Claim Construction Appendices which were previously filed with the Court.

This element refers to and should be construed to mean the surface 16b of the carrier part 16 (App. Ex. 1, Fig. 2) a portion of which engages the plane surface 32 of the knife 12 that supports the knife when under load.[4]   The plane surface 32 is on the forward face of the knife in the direction of knife movement (to the left in Figure 2).  The upper load bearing surface 16b faces towards the surface of the disk 10 on which the clamp or knife holder assembly is mounted

---

[4]   The reference numerals 16a and 16b were added to the drawings by the Examiner in an Examiner's Amendment accompanying a Notice of Allowability dated January 23, 2004 (App. Ex. 4, pp. 314-319, specifically at p. 318).  The drawing the Examiner refers to does not appear in the Patent Office file apparently because it was sent to the Applicant's counsel.  A copy of that drawing as received by Iggesund's counsel is attached at Tab C.  The Examiner in the same Amendment, p. 317, also made several changes to the specification, one, identified as L6 in the left margin at p. 317 and referring to an earlier amendment appearing at pp. 254-255 which first inserted the reference number "16b" into the specification.  That insertion now appears at Col. 2, ll. 9 and 10 of the patent.  Clearly that insertion was intended to be "16a" since it refers to the "outer surface of the carrier part 16" which was marked 16a by the Examiner in the drawing at Tab C.  The second change he made is marked L7 at p. 317 and was to have been made to the prior amendment at page 255.  The insertion is marked on page 255 and, by comparing the text at page 255 and at Column 2 of the patent, that insert should have appeared in Col. 2, line 24 after the word "corresponding".  The patent was not printed that way.  However, the file history makes it clear the "16a" refers to the outer surface of the carrier part and "16b" refers to its upper load bearing surface.  It is noted that these Examiner's Amendments were properly included in the '313 patent Col. 2, ll. 16 and 36.

(Fig. 2) (App. Ex. 1, Col. 2, ll. 32-36).  (See also App. Ex. 4,  p. 20, which contains the Examiner's hand written notes on a copy of Figure 2.)

*"first knife edge forming surface"*
**JCCS App. B-1, p. 4)**

The first knife edge forming surface is the surface 30 (App. Ex. 1, Col. 2, ll.25-28) which is on the rear or back side of the knife in the direction of the knife's movement and which intersects with the chip breaking surface 22 to form the knife cutting edge 34 (App. Ex. 1, Col. 2, ll.25-28; App. Ex. 4 p. 20.)  Iggesund notes that Key Knife's proposed construction defines this surface as "essentially coinciding with the first surface of the cutter disk" in an apparent attempt to improperly import into the claim a description from the specification (Col. 2, ll. 26-27) which does not appear in the claim itself.  *Phillips*, 415 F.3d at 1323-1324.

*"downwardly in the direction of chip flow".*
**JCCS App. B-1, p. 6**

As seen in Figure 2, the first chip directing portion 22′ (App. Ex.4, p. 20) projects in a direction from the knife which is in the direction of chip flow in the opening or passageway 14 adjacent to the knife 12 and carrier part 16 (through which the chips flow) towards the opposite or lower side of the disk 10 (App. Ex. 1, Col. 1, ll. 11 - 13, Col. 2 ll. 36-40; App. Ex. 4, p153 ll 3-7; p213 ll5-17, Webster's Dictionary, App. Ex. 9, pp. 236, 251, definitions of "direction" and "downwardly").

Key Knife's proposed construction suggests this limitation should mean the rib is oriented in the <u>same</u> direction the chips flow.  There is no support for use of the limiting expression "same".  Chips cut and or broken by the knife edge and breaking surface do not all flow in the exact "same" direction at all times.  They do all flow down the passageway or opening 14 from the "top" side of the disk to the "bottom", but in doing so some will also hit the chip directing surface 22′ and be deflected away from the carrier surface 16a and some will not.  Some will hit the opposite side of the opening.  The limitation is "downwardly in the direction of chip flow" – not the "same direction".

***"a point which is located beyond…in the direction of chip flow"***
***JCCS App. B-1, p. 7***

This refers to the spot or place where the chip directing portion 22′ of the chip breaking surface ends and intersects or joins with the rear flat surface 32 of the knife 12, which spot or place is spaced from and opposite, or to the side of, the outer surface 16a of carrier part 16 and below, in the direction of travel of the chips, the intersection of the outer surface of the carrier part with the previously defined upper load bearing surfaces of the carrier part (App. Ex. 1, Fig. 2, Col. 2, ll. 34-40; ll. 16 - 21; App. Ex. 4, p 20; p 16 ll. 8 – 14; App. Ex. 9, pp 654, 496, 82, definitions of "point", "locate" and "beyond").

Key Knife's construction of this limitation is simply a reordering of the claim language. If the clause needs construction, using the same words is unhelpful. Iggesund's proposal uses different, albeit, equivalent words from dictionary definitions to explain the claim language.

**"being oriented along a first plane … the first surface of the cutter disks".**
**JCCS App. B-1, p. 8**

The second knife support surface 32 of the knife 12 is a plane surface arranged or located along the plane $P_1$ ("the first plane") that extends outwardly from the knife, as seen in Fig. 2 of the '595 patent in a different direction from the first surface of the cutter disk (App. Ex. 1, Col. 2, ll.32- 42; App. Ex. 4, p. 152, ll.16 – p. 154, p 3 and p. 155; App. Ex. 9, p. 595, 244, definitions of "orient" and "diverge"). Key Knife's construction simply repeats the claim language "away from" and does not acknowledge the different orientation of the plane of the first surface of the cutter disk and the "first plane" $P_1$ of the second knife support surface.

**"at a substantially acute angle… and first surface of the disk".**
**JCCS App. B-1, p. 8**

The plane along which the second knife support surface 32 is oriented is located at an acute angle (*i.e.*, an angle of less than 90º) to the planes of the surfaces on which the first knife edge forming surface and first surface of the disk lie. This is shown in Figure 2 of the '595 patent and described in App. Ex. 1, Col.

2, ll. 36 – 42.  (See also App. Ex. 4 pp. 152, l. 6 - p. 154, l. 3, p. 155, 172, ll. 6 - 21;

p. 213, l. 5 - p 214 l. 9, p. 218, App. Ex. 9 p. 10, definition of "acute").

Key Knife proposes that this clause means the first plane "extends out

to cross the first knife edge forming surface".  This is incorrect.  The claim says the

first plane "diverges out from the knife <u>away</u> from the first knife forming surface"

(emphasis added) and simply says that this first plane is "oriented", i.e. located, at

an angle of less than 90° to that surface.  Nothing in the specification or claim

describes or suggests the "first plane" actually crosses the first knife edge forming

surface 30.  In fact, if one were to extend the planes $P_1$ and $P_2$ as shown in Fig. 2 of

the '595 patent, their intersection would form an acute angle, but that intersection

does <u>not</u> occur on first knife edge forming surface 30.

***"and downwardly in the direction of chip flow in the passageway"***
***JCCS App. B-1, p. 9***

The second, knife support surface 32 of the knife, as seen in Figure 2

of the '595 patent, also projects from the knife in a direction which is in the

direction of the chip flow in the passageway defined by opening 14 from the knife

towards the bottom or second surface of the disk 10.  (App. Ex. 1, Col. 2, ll. 36 -

42, App. Ex. 4, pp. 116, 153, 208, 209, 213 supra.)

Key Knife's proposed construction ignores the fact that the claim

specifically defines the "direction of chip flow" as being the direction (downward)

the chips flow in the passageway.  In fact, the Examiner first indicated issued claim 1 to be allowable over the prior art in an Office Action dated February 13, 2001 (App. Ex. 4, pp. 244) after substantively considering Iggesund's March 21, 2000 claim amendments which, *inter alia*, amended the claim to include the term "downwardly."  (App. Ex. 4, p. 208, 209).

***"the first and second surfaces of the rib intersect at an acute angle"***
***JCCS App. B-1, p. 10***

    The extended planes on which the first chip directing portion 22′ and the second knife support surface 32 of the rib, respectively, lie will intersect (i.e., pass through, meet or cross) at an angle of less than 90º.  (App. Ex. 1, Fig 2; App. Ex. 4, p. 213, l. 5 – p. 214, l. 9, p. 218; App. Ex. 9, p. 443 definition of "intersect").

    Contrary to Key Knife's proposed construction these surfaces do not necessarily form a sharp "point" and nothing limits the disclosure in that way.  As shown in the drawings the two surfaces merge or form a rounded tip and there is an acute angle between them.  (App. Ex. 4 at pp. 213-214 and 218 and discussion of Planes B and E. As shown in App. Ex. 1 at p. 218, Planes B and E cross at a point proximate to but not actually at the tip of the rib due to the rounding of the rib.)

***"below the point at which the outer surface of the carrier part intersects the load***
***bearing contact surface of the carrier part"***
***JCCS App. B-1, p. 10***

The spot or place at which the intersection of the surfaces 22′, 32 occurs is below, in the direction of travel of the chips, the point, spot or place where the outer surface of the carrier part 16 intersects the upwardly facing load bearing surface 16b of the carrier part which engages and supports knife surface 32.  (App. Ex. 1, Fig 2, Col. 2, ll. 16 - 21; App. Ex. 4, p 116, ll. 8 - 14.  App. Ex. 9, p 654 definition of "point".)

**B.      ‛313 Patent**

***Claim 1***

***"first knife edge forming surface"***
***JCCS App. B-1, p. 13***

This is the same element referred to in Claim 1 of the ‛595 patent and should be construed the same way.  See page 12, supra.

***"a first chip directing portion which defines said chip directing portion of the knife…along a first plane'***
***JCCS App. B-1, p. 15***

The generally concave chip directing portion 22′ of the knife is defined by the first chip directing portion of the rib, and extends away from the generally flat surface portion of the chip breaking surface along a first plane.  (App. Ex. 1, Fig. 2 Col. 2 ll. 16 - 21; App. Ex. 2, Col. 2, ll. 9 - 23).  The later portion of the ‛313 patent specification makes it clear that it is the concave chip directing portion 22′ (see Col. 2, ll. 23 - 33) "that forms the rib or protrusion 24".  This was reiterated to the Examiner during the prosecution of the ‛313 Patent in an

-18-

Amendment filed April 8, 2004 where it was stated (App. Ex. 5, p. 57, ll. 11-16) that "rib 24 has a chip directing portion 22′ which defines the chip directing portion of the knife which extends outwardly from the planar portion 22a generally along a plane 24a [not referred to in the specification but drawn for the Examiner on a copy of Figure 2, App. Ex. 5, p. 76] which is transverse to a second plane $P_2$ defined by the first knife edge forming surface 30." This was again reiterated in a later amendment (App. Ex. 5, p. 93) wherein a summary of an interview with the Examiner was discussed stating "Claim 7 as last presented specified that the chip breaking surface of the knife…included a planar portion …22…and a concave chip directing portion indicated by 22′…The common definition of the term 'concave' does not encompass a V-shaped surface, but rather encompasses smoothly curved surfaces. Accordingly, Claim 7 has been amended to more specifically define that concave chip directing portion as a continuous, smoothly curved generally chip directing portion." (See also App. Ex. 9, pp. 171, 900, definitions of "concave" and "outwardly.")

This element of the claim refers to concave surface 22′ extending generally along a "first plane", in this case the plane 24a shown in the drawing on page 76 of App. Ex. 5, which, the claim goes on to say, extends transverse to the "second plane" $P_2$ shown in the same drawing. The claim does not mean the concave surface is flat and does not say that the surface 22′ extends transverse to

-19-

plane $P_2$; it only says the plane along which this "slightly concave shaped" surface (Col. 2, ll. 30-35) lies is transverse to plane $P_2$. Thus it is simply a part of the curve, as clearly shown in Fig. 2 at App. Ex. 5, p. 76 that "lies" on a plane that is transverse to another plane $P_2$.

Key Knife apparently contends that the rib has two chip directing portions, one planar and the other concave. Key Knife's contention that the concave surface 22′ should be construed in this claim as having a "planar first chip directing portion" which somehow "bounds" a separate [curved concave] chip directing portion is unsupported by the evidence it cites and contrary to the disclosure of the patent drawings and specification, neither of which show or describe such a "planar 'first, chip directing portion'". Moreover, the first, chip directing portion is recited as extending "generally along a first plane." The use of the term "generally" is consistent with a concave rather than planar chip directing portion.

*"which is traverse to a second plane defined by said first knife edge forming surface"*
*JCCS App. B-1, p. 16*

As noted above the plane 24a shown at App., Ex. 5, p. 76 crosses and extends transversely of the "second plane" $P_2$ along which the first knife edge forming surface is located (App. Ex. 2, Fig. 2; App., Ex. 5, p. 76, App. Ex. 9, p. 942 definition of "transverse".)

Key Knife's construction refers to the "rib's first plane", again to imply that the curved concave chip directing portion 22′ has a planar surface. There is no support for that construction in the evidence it relies on.

### *"diverges outwardly from the knife body behind said chip deflecting surface" JCCS App. B-1, p. 16*

The term "chip deflecting surface" does not appear in the specification of the '595 or '313 patent.  It first was used, incorrectly, during the prosecution of the '595 patent in the claim which ultimately became Claim 1 of that patent.  The erroneous use of that term was noted by the Examiner when he finally allowed that claim of the '595 patent and he, *sua sponte*, made an Examiner's Amendment. (App. Ex. 4, pp. 314-315) changing the term "chip deflecting surface" to the term "chip directing portion" which is used in the specification.

The claim which became Claim 1 in the '313 patent (Claim 7 of the preliminary amendment filed with the application App. Ex. 5, p. 25) was based on the claim in the prosecution of the '595 patent (which had incorrectly used "chip deflecting surface") and hence it also used the term "chip deflecting surface."  The file histories show these incorrectly worded claims were pending at the <u>same</u> time. In April 2004, a few months after the Examiner's Amendment referred to above, an amendment was filed to Claim 7 of the '313 patent application (App. Ex. 5, pp. 50-76) in which the term "chip deflecting surface" was corrected at the

corresponding point in the claim (App. Ex. 5, p. 53) at which the Examiner had made the earlier correction.  However, the incorrect usage of "chip deflecting surface" was not corrected later in the claim in the expression "<u>said</u> chip deflecting surface."  (Emphasis added.)  Since there is no antecedent for that term in the claim and since, by the presence of the word "said", it is clear that phrase can only be referring to the phrase "chip deflecting surface" used earlier in the claim (which was changed to "chip directing portion"), Iggesund submits the phrase "said chip deflecting surface" must be construed to mean "chip directing portion". [5]

Accordingly the limitation at issue here should be construed to mean that the first knife support surface of the knife, i.e., the surface 32, is oriented along a third plane (i.e., plane $P_1$ shown in Fig. 2 of the '313 patent) which extends outwardly from the knife itself in a different direction from the first knife edge forming surface 30 and behind the chip directing portion 22′.  This is what is shown in Fig. 2 of both the '595 and '313 patents.  (See also App. Ex. 1, Col. 2,

_____

[5]  The terms themselves are equivalent in the art.  The term "chip directing surface" is used in these cases by Iggesund to refer to the concave surface 22' which redirects or deflects chips and the term "deflecting surface" is used by the founders of Key Knife for similar concave surfaces on knives.  (surfaces 24a, 26a and Col. 2 ll. 41-43 of U.S. Patent No. 4,669,516, Tab D and cited by the Examiner in both the '595 and '313 patents.)

lines 32-45; App. Ex. 2, Col. 2, ll. 38-44; App., Ex. 4, pp. 152-154, 155; App. Ex. 5, pp. 75, 76; App. Ex. 9, p. 244 definition of "diverge.")

Key Knife's proposed construction is an attempt to import or read into this element its erroneous view that the "first chip directing portion" is flat.

**"said chip deflecting surface"**
**JCCS App. B-1, p. 17**

This should be construed to mean "said chip directing portion" for the reasons discussed immediately above with respect to the preceding claim element.

**"at an acute angle to said chip deflecting surface"**
**JCCS App. B-1, p. 17-18**

This means that the third plane ($P_1$, App. Ex. 5, p. 76) along which the knife support surface 32 of the rib is positioned intersects the first plane (24a, App. Ex. 5, p. 76) along which part of the first chip directing portion 22′ lies at an angle of less than 90°.  (App. Ex. 2, Fig. 2; App. Ex. 4 pp. 152-154, 155, 172, 213-24, 218; App. Ex. 5, pp. 75, 76).

Key Knife's construction of this element and the immediately preceding one is simply a continuation of its attempt to construe "chip directing portion" and "chip deflecting surface" as two different elements, one of which is flat, when that is clearly not true.

**"said acute angle being defined substantially within the rib between said first and third planes"**
**JCCS App. B-1, p. 17-18**

The acute angle defined by the intersection of planes 24a and $P_1$ (App. Ex. 5, p. 76) is located substantially within the rib.  This is the angle marked $\theta$ at App. Ex. 5, p. 76).

***"said first knife support surface and said chip deflecting surface converging to form a tip portion of said rib"***
***JCCS App. B-1, p. 18***

The first knife support surface 32 and the chip directing portion 22′ move towards each other to form a small end or point of the rib as shown in Fig. 2 of the '313 Patent which, as illustrated, may be rounded.  (App. Ex. 9, pp. 182, 927 definitions of "converge" and "tip".)

***"said first and third planes intersecting substantially at said tip portion"***
***JCCS App. B-1, p. 18***

The small end formed by the convergence of the surfaces 32 and 22′ is located approximately where planes 24a and $P_1$ intersect ('313 Patent, Fig. 2, App B-1, Ex. 5, pp. 75, 76).  Key Knife's proposed construction appears to require the two sides of the rib to come to an actual sharp point, and to preclude a rounded tip. That is incorrect since it excludes the embodiment shown at Fig. 2 of the patent. (See also the above discussion at page 16 of the term "the first and second surfaces of the rib intersect at an acute angle".)

***"said second and third planes intersecting at a point located within the area of projection of the knife onto said second plane"***
***JCCS App. B-1, p. 18 - 19***

The intersection of planes $P_1$ and $P_2$ forms a line that extends through a point (point C at App. Ex. 4, p. 218) situated within the confines of the area of projection of the knife onto the second plane $P_2$ at a right angle to the second plane.

Key Knife's proposed construction includes the expression "outside the area occupied by the knife" which is redundant to the next and last element of the claim that the parties agreed to leave unconstrued and susceptible to a plain meaning understanding.

### C.    '626 Patent

#### *Claim 5*

***"a first clamping surface"***
***JCCS App. B-1, p. 17***

This is a surface on the knife which has at least a portion available for use in clamping the knife in a woodworking machine.  It is the surface 40 shown in Figures 1 – 3 and described at Col. 6, l. 64 – Col. 7 l. l. 1, of the '626 Patent (App. Ex. 3.)

***"a second opposed clamping surface"***
***JCCS App. B-1, p. 21***

This is another surface of the knife which is on a side of the knife opposite from the first clamping surface and at least a portion of which is available for clamping the knife in a woodworking machine.  This is the surface 38 as shown

in Figures 1 – 3 and described at Col. 6, l. 64 – Col. 7, l. 3 of the '626 Patent.

(App. Ex. 3; see also App. Ex. 9 p. 592, definitions of "oppose" and "opposite".)

***"opposed clamping features"***
***JCCS App. B-1, p. 21***

These are prominent structures, forms or characteristics of the first

clamping surface which are located across from and at least partially facing each

other as shown in Figures 1 – 5, elements 48, 50 and 148, 150 of the patent and

described at Col. 10, ll. 9 – 19 and Col. 11, ll. 11 – 22, App. Ex. 3.  (See also App.

Ex. 9 pp. 592, 305, definitions of "oppose", "opposite" and feature".)

Key Knife's proposed construction refers to "areas in opposite ends of

that surface".  The term "area" would encompass simply a part of the first

clamping surface not a "feature".  In addition the expression "ends" is not used in

the claims or anywhere else to describe the location of these features.  The word is

vague in this context as it is not clear if it refers to the longitudinal "ends" of the

knife or to the "ends" of its width.  There is no requirement in the patent that the

clamping features be located at the "ends" of the first clamping surface.  In fact,

they are not in all the embodiments shown in Figs. 1-5 of the '626 patent.

***"opposing surface portions inclined with respect  to each other"***
***JCCS App. B-1, p. 22***

The opposed clamping features have portions of their respective

surfaces that are sloped with respect to each other and generally face toward each

-26-

other.  These are shown in App. Ex. 3, Figures 3 – 5 at 148, 150 and in Figure 2, as shown in the copy of that Figure attached at Tab B, where the "opposed surface portions inclined with respect to each other" are separately marked 48a and 50a. (See also Appendix Ex. 6, p. 103, ll. 1 – 5; p. 227, l. 19; p. 229, ll. 5 – 12; p. 291, ll. 14 – 16 (Examiner's Statement of reasons for allowance); p. 292, ll. 15 – 21 (Id.); App. Ex. 9, p. 592, 305, 423 definitions of "oppose", "opposite", feature", "incline" and "inclined".)

Key Knife's construction includes the expression "on opposite ends of the clamping feature" and is wrong for the reasons discussed in connection with the preceding element.  Key Knife's construction also improperly interprets the term "inclined with respect to each other" to refer to opposed portions or sides of a single clamping feature rather than to refer to the respective orientation of portions of two opposed clamping features.  Such a construction would exclude coverage of the embodiments shown in Figs. 3 and 4 of the '626 patent.  It is also inconsistent with Iggesund's efforts during prosecution to distinguish the claim over the Derivaz reference because the two separate clamping features (13, 13′) of Derivaz were not inclined with respect to each other.  (App. Ex. 6, p. 226, l. 13, p. 227, l. 3.)

***"the localization of the clamping forces on the first clamping surface …away from said middle section"***
***JCCS App. B-1, pp. 22 - 23***

When the knife is inserted into the clamping assembly the clamping forces are restricted to specific or limited areas on the first clamping surface which are defined by the two opposed clamping features, i.e., at the opposing surface portions that are inclined with respect to each other, and that the clamping forces applied to the first clamping surfaces are concentrated away from the middle section of the knife and towards the cutting edges of the knife.  This is shown in App. Ex. 3, Figures 2 – 5 and described at Col. 11, ll. 11 – 22 and 47 – 54.  (See also App. Ex. 6, p. 100, l. 19 – p. 101 l. 3 and p. 102 ll. 11 – 14, App. Ex. 9 pp. 496, 305, definitions of "localize", "locate" and "feature".)

Key Knife's proposed construction equates the term localization to "positioning".  The latter term does not appear in the specification as a synonym for "localization" and is not part of the ordinary English definition of the word "localize".  (App. Ex. 9, p. 436.)  Key Knife would have the Court believe that the claim language speaks only to the position or location at which the clamping force acts, and not the fact that the clamping features focus the forces applied to them in a specific way.  Moreover, its construction is inconsistent with the prosecution history and arguments made to distinguish the claims over the Derivaz reference.  For example, the claim language "localized and located" was added to issued claim 4 (then claim 5) in an Amendment (see App. Ex. 6, p. 189), in which Iggesund distinguished that claim over the Derivaz reference.  If the term "localized" as used

in the patent were synonymous with "locate," Iggesund would have had no reason to use both terms.  And, Iggesund distinguished the claims over Derivaz (See Tab E at Fig. 2) based on the inclination of opposed clamping features and the localization of the clamping forces toward the cutting edges of the knife.  The clamping features (13, 13′) in Derivaz were spaced or located on different sides of the center of the Derivaz knife but those clamping features were flat.  (See Tab E at Fig. 2).  Therefore, the clamping features in Derivaz did not focus or direct the clamping forces applied to them away from the middle section of the knife or toward the cutting edges.  Rather, the clamping forces on both clamping features operated in a direction perpendicular to the cutting edges.  Thus, Derivaz did not prevent twisting as did the claimed orientation.  (See App. Ex. 6, pp. 226, l. 13 – p. 229, l. 12).

Finally, Key Knife's proposed construction also contends that "clamping forces occurs only on the opposed clamping features".  That is not accurate.  The claim says "localization of the clamping force occurs only at" the clamping feature.  The patent clearly contemplates that clamping forces can also occur elsewhere.  (See App. Ex. 3, Col. 10, ll. 39-51, Claims 20-22.)

***"the first clamping surface comprises a rear clamping surface of the knife body"***
***JCCS App. B-1, p. 24***

The '626 patent defines the first clamping surface as a rear or back clamping surface of the knife which is positioned to face away from the direction of movement or rotation of the knife, as indicated by the Arrow A in Figure 1 and is clearly described at App. Ex. 3, Col. 6, ll. 66 – Col. 7. l. 4.  This is a common method of describing knife surfaces.  (See Ex. 7, Col. 2, ll. 64-67, Figs. 5 and 6 and Ex. 8, Col. 6, ll. 3-15, Fig. 8.)

***"the second clamping surface comprises a front clamping surface of the knife"***
***JCCS App. B-1, p. 24***

This is the surface of the knife opposite the first clamping surface which is the front or forward facing surface of the knife positioned to face the direction of rotation or the direction of the cutting action of the knife.  (App. Ex. 3, Col. 6, Id.; App. Ex. 6 and 7, Id.)

***<u>Claim 16</u>***

***"pair of opposed clamping features"***
***JCCS App. B-1, p. 25***

These are the same two opposed clamping features as defined above and shown and described in Figures 2 – 5 of App. Ex. 3 at Col. 10, ll. 9 – 19 and Col. 11, ll. 11 – 16.  (See also App. Ex. 9, pp. 305, 592, definitions of "features" and "oppose".)

Key Knife's proposed construction here again refers to "areas" and "ends".  This is improper for the reasons discussed above at Pages 24-25.

-30-

***"first clamping component being sized and shaped to exert a clamping force on the opposed clamping features of the knife"***
***JCCS App. B-1, pp. 25 – 26***

The first clamping component, i.e., the rear clamping component 18, is dimensioned and formed relative to the clamp features on the knife to bring to bear a clamping force on the two opposed clamping features.  This is described at App. Ex. 3, Col. 11, ll. 20 – 22 and ll. 47 – 54.  (See also App. Ex. 6, p. 103 ll. 1 – 5 and p. 227 ll. 4 – 9; App. Ex. 9, pp. 814, 792 and 291, definitions of "size", "shaft" and "exert".)

Key Knife's proposed construction basically uses the claim language but changes the expression "to exert a clamping force on" to "to contact the".  The claim clearly requires more than merely "contact" and therefore Key Knife's proposed construction is incorrect.

***"localized toward the cutting edge"***
***JCCS App. B-1, p. 26***

The clamping forces applied to the two opposed clamping features are concentrated at specific or limited areas of the knife on the clamping features in the direction of the cutting edges.  This is described in App. Ex. 3 at col. 11, ll. 20 – 23 and in the file history therefor at App. Ex. 6, p. 229 ll. 5 – 12.  (See also App. Ex. 9 p. 496, definition of "locate".)

As discussed at Page 26 above, Key Knife's use of "position" as a substitute for "localized" or "localization" is incorrect and without support in its cited evidence.  The point is even more clear in asserted claim 16 because the direction in which the clamping forces act, i.e., "toward the cutting edges," is expressly recited.

***"when the knife is clamped in the clamping assembly, a clamping force…and away from a middle section of the knife".***
***JCCS App. B-1, p. 26***

The same intrinsic and extrinsic evidence cited for the prior claim element demonstrates that this element means that when the knife is clamped in the clamping assembly, the clamping force on the knife from the clamping component is restricted to the specific or limited areas of the clamping features in the direction of the cutting edges of the knife and away from  the middle section.

Here again, Key Knife improperly proposes to substitute "positioned" for "localized".

***"first clamping component being sized and shaped to register with the opposed clamping features of the knife"***
***JCCS App. B-1, p. 27***

The patent specification describes this element at App. Ex. 3, Col. 11, ll. 20 – 30 and 33 – 54 which, with the standard dictionary definition meaning of the words "size", "sized", "shape" and "register", demonstrates that this clause means the first clamping component is formed relative to the clamping features to

cause the knife and clamping components to align with each other to index the knife.

Key Knife's proposed construction suggests that it is the "clamping assembly" which is sized and shaped to register with the opposed clamping features. This is clearly incorrect since the element under consideration is only the "first clamping component" of that assembly. In addition, Key Knife's construction substitutes the word "conform" for "register". "Conform" is not a synonym for "register" whose applicable definition is "a condition of correct alignment" (App. Ex. 9, p. 721). The word "conform" connotes that two elements are "similar or identical" (App. Ex. 9, p. 175) and thus may require in this context that the surfaces of the clamp that engage the inclined clamping features be the identical size and shape. However, such identity is not required for two things to "register". For example, the clamping surfaces of the clamp could be shorter in length and width than the inclined surfaces of the clamping features on the knife. Therefore, Key Knife's proposed construction is incorrect.

***"opposing surface sections inclined with respect to each other"***
***JCCS App. B-1, p. 27***

This element has the same meaning in this claim as the similar phrase "opposing surface portions . . ." has in Claim 5 as described above, pp. 23-24. Key

Knife's proposed construction is incorrect for the same reasons set forth in that discussion.

**"*wherein the first clamping component is fixedly attachable to a movable base of the woodworking machine "***
**JCCS App. B-1, p. 27 - 28**

      This structure is shown in App. Ex. 3 in Figure 1 and described at Col 6, ll. 29 – 35 as well as in Figure 6B and at Col. 12, ll. 20 – 26, wherein the first clamping component 18 is able to be fastened in a stable or firm position by a bolt 16 (or locking screw 76) to the movable (rotatable) base 22 of the woodworking machines.  (See also App Ex. 9, pp. 315 and 56, definitions of "fix" and "attach".)

      Key Knife's proposed construction incorporating the expression "attached in a fixed manner" suggests that the first clamping component is permanently secured when the patent clearly discloses that it can be secured to and removed from the base.  Therefore Key Knife's construction is too narrow.

**"*wherein the second clamping component is attachable to the base so as to be movable between an open position and a clamping position*"**
**JCCS App B-1 p. 28**

      In the embodiment of Figure 6B the second or front clamping component 20, which is not engaged with the clamping features, is fastened to the base 22 of the woodworking machine by bolt 16 so it can be moved or displaced between a position, i.e., an open position, wherein it is disengaged from the knife and a position wherein it engages and applies clamping forces to the knife, i.e. in

its clamping position.  (App. Ex. 3, Col. 12, ll. 20 - col. 13, ll. 41; App. Ex. 9, p.

56, definition of "attach").

### *Claim 31*

***"opposed second clamping surface"***
***JCCS App. B-1 p. 29***

This element has the same meaning as the same element "a second

opposed clamping surface" used in Claim 5 as described supra p. 23.

***"first clamping surface having opposed clamping features respectively including***
***surface portions which are inclined with respect to each other"***
***JCCS App. B-1, p. 29***

This claim element is essentially identical to the claim element

"opposing surface portions inclined with respect to each other" discussed above,

pp. 23-24, with respect to Claim 5.  These elements are shown particularly in App.

Ex. 3 Figures 3-5 as the surfaces 148, 150 and in Figure 2, as reproduced at Tab B

herein, as the surfaces 48a and 50a.  They are described at App. Ex. 3, col. 11, ll.

11-16, 20-23; col. 10, ll. 9-19, col. 17, ll. 21-22.  (This is unasserted Claim 30

which is specifically directed to this use of concave hollows 48, 50 and, by the

doctrine of claim differentiation, that claim demonstrates the language of claim 29

is broader than claim 30 and is intended to cover the embodiments of Figure 3-5, in

addition to the embodiment of Figure 2).  Hence, this element should be construed

to mean that the first clamping surface has surface portions that are each sloped

and located across from and facing each other.  (See also App. Ex. 9, pp. 592, 732, 423, and 305, definitions of "oppose", "opposite",  "respectively", "inclines", "inclined", and "feature".)

Key Knife's proposed construction evidently would limit this element to a knife in which each clamping feature would have two inclined surfaces facing each other as illustrated below:



Nothing in the claim language or in Key Knife's cited evidence supports such a limitation and such a construction violates the doctrine of claim differentiation.

***"opposed clamping features and the middle section of the first clamping surface being sized and shaped . . . and away from said middle section"***
***JCCS, App. B-1, p. 30***

This feature is shown in App. Ex. 3, Figures 3-5 and described at Col. 11, ll. 33-54[6] and Col. 11, ll. 20-23.  It is also described at App. Ex. 6, p. 100, l. 12 - 101, l 3; p.102, ll. 18-22; p. 229, ll. 5-12; p. 291.  (See also App. Ex. 9, pp. 592, 305, 814, 797, definitions of "oppose"; "opposite", "feature", "size" and "shape".)

---

[6]    Erroneously identified in JCCS App. B-1, p. 30 as "col. 7"

Based on this intrinsic and extrinsic evidence this clause should be construed to mean that the two opposed clamping features and the middle section of the first clamping surface are dimensioned and formed so that when a clamping force is applied to the clamping features the application of that force is concentrated on the clamping features in the direction of the cutting edges.

Key Knife's proposed construction uses the expression "positioned near the opposed cutting edges".  Nothing in the specification of the patent, the claim or Key Knife's cited evidence uses the term "positioned near".  The localization of the clamping forces causes the forces to be concentrated on the clamping features and focused towards the cutting edge.  The claim does not say the forces are "positioned near" the edges, whatever "near" may mean.

**"the first clamping surface comprises a rear clamping surface of the knife body"**
**JCCS, App. B-1, p. 30.**

This claim element has the same meaning as the identical claim element of Claim 5, supra p. 28.

**"the second clamping surface comprises a front clamping surface of the knife body"**
**JCC, App. B-1, pp. 30-33.**

This claim element has the same meaning as the identical claim element of Claim 5, supra, p. 28.

**<u>Claim 51</u>**

*"a pair of opposed clamping features."*
*JCCS App. B-1, p. 31.*

This element has the same meaning as the identical element of Claim

16 discussed infra pp. 28-29.

*"first clamping component being sized and shaped to exert a clamping force on*
*the opposing clamping features of the knife such that"*
*JCCS, App. B-1, p. 32.*

This element has the same meaning as the identical element of Claim

16 discussed infra, p. 29.

*"when the knife is clamped in the clamping assembly a clamping force . . . is*
*localized toward the cutting edges of the knife and away from a middle section of*
*the knife"*
*JCCS App. B-1, pp. 32-33.*

This element has the same meaning as the identical element appearing

in Claim 16 and discussed infra, p. 30.

*"first clamping component being sized and shaped to register with the opposed*
*clamping features of the knife"*
*JCCS App B-1, p. 33*

This element has the same meaning as the identical element appearing

in Claim 16 and discussed infra, pp. 30-31.

*"said clamping features comprising opposing inclined surface sections"*
*JCCS App B-1, p. 33.*

This element has the same meaning as the substantial identical

element "opposing surface sections inclined with respect to each other" of Claim 5

discussed infra pp. 25-26.

***"wherein the first clamping component comprises a rear clamping component"***
***JCCS App B-1, p. 34***

This is element 8 shown in App Ex. 3, Figure 1 and described at Col. 6, ll. 29-35 and col. 7, ll. 8-21[7].  It therefore refers to the clamping component which is at the rear or back of the knife positioned to face away from the direction of rotation (Arrow A in Fig. 1) and/or direction of the cutting action of the knife in the woodworking machine.

***"wherein the second clamping component comprises a front clamping component.***
***JCCS App. B-1, p. 35.***

This is element 20 shown in App, Ex. 3, Figure 1 and described at Col. 6, ll. 29-35 and Col. 7, ll. 8-21[8].  It therefore refers to the clamping component which is at the front or forward facing surface of the knife positioned in the direction of rotation and/or cutting action of the knife in the woodworking machine.

_____

[7]   A typographical error occurred at page 29 of the Joint Claim Construction Chart and page 34 Iggesund's listing of intrinsic and extrinsic evidence.  Since this element clearly is referring to a "clamping component", the first two lines of Iggesund's proposal should have read "the clamping component which is at the rear of".

[8]   A typographical error occurred at page 29 of the Joint Claim Construction Chart and page 34 Iggesund's display of intrinsic and extrinsic evidences.  Since this element also clearly is referring to a clamping component, the first two lines of Iggesund's proposal should have read "the clamping component which is at the front of".

## CONCLUSION

For all the reasons discussed above, Iggesund contends that its proposed claim constructions as set forth herein and on the Joint Claim Construction Chart at Tab A as proposed by Iggesund, should be the constructions adopted by the Court.

Respectfully submitted,


s/ *George L. Murphy, Jr.*
Pasquale A. Razzano
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, New York 10112-3801
Tel.:  (212) 218-2100
Fax:  (212) 218-2200
prazzano@fchs.com

George L. Murphy, Jr.
Georgia Bar Number 530376
Audra A. Dial
Georgia Bar Number 220298
Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia 30309
Tel.: (404) 815-6500
Fax: (404) 815-6555
gmurphy@kilpatrickstockton.com
adial@kilpatrickstockton.com

Counsel for Plaintiffs

FCHS_WS 1702397_1.DOC

-40-

# CERTIFICATE OF COMPLIANCE

I hereby certify, in accordance with Local Rule 7.1D, that the foregoing document was prepared using 14 point Times New Roman font, one of the font and point selections approved this Court in Local Rule 5.1C.

_s/ *George L. Murphy, Jr.*_

George L. Murphy, Jr.
Georgia Bar Number 530376
Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia 30309
Tel.:   (404) 815-6500
Fax:   (404) 815-6555
gmurphy@kilpatrickstockton.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing IGGESUND'S OPENING CLAIM CONSTRUCTION BRIEF with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

John M. Bowler (john.bowler@troutmansanders.com)

Douglas D. Salyers (doug.salyers@troutmansanders.com)

This 13th day of November, 2007.

s/ *George L. Murphy, Jr.*
George L. Murphy, Jr.
Georgia Bar Number 530376
Kilpatrick Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, Georgia 30309
Tel.:  (404) 815-6500
Fax:  (404) 815-6555
gmurphy@kilpatrickstockton.com